# Telford *against* Adams.

Although a contract for the sale of goods may be fraudulent and void as to creditors, yet it will be binding as between the parties to it: and in any controversy on that subject between them, it is the duty of the court to instruct the jury to enforce the contract as made.

ERROR to the common pleas of *Allegheny* county.

Allen & Grant and James S. Graft, trading in the name of Adams, Allen & Co., against James Telford & Son.

In the court of common pleas of Allegheny county of June term 1835, No. 157, at the instance of Adams, Allen & Co., a *scire facias* was issued to revive judgment on No. 373 of August term 1830. July 30th, 1835, defendants pleaded payment and filed their affi-davits of defence.

On the 4th of February 1836, a rule was granted to show cause why the judgment on which the *scire facias* was issued should not be opened and the defendants let into a defence.   On the 20th of September 1836, agreement of counsel filed in the following words, viz: " It is agreed that under the pleadings in this case, the merits of the case shall be fully examined, and the state of the accounts between the parties fully investigated and passed upon, and that an execution may issue in favour of either party, plaintiffs or

[Telford v. Adams.]

defendants, to whom such balance may be ascertained to be due, subject to writ of error by either party, as in other cases."

On the trial, the plaintiffs, to support their claim, produced in evidence a judgment bond dated the 1st of September 1830, in the penalty of 6000 dollars, conditioned for the payment of all endorsements or responsibilities incurred or to be incurred by the plaintiffs on account of the defendants.

After the exhibition of said bond, plaintiffs produced certain notes and evidences of debt indicating the amount assumed by them, for and on behalf of the defendants, and claimed to recover on said suit a sum equal to the amount thus shown.

The defendants objected to the recovery by the plaintiffs on the ground that they had sold and delivered to the plaintiffs manufactured fabrics, at certain fixed prices, greatly exceeding the amount of plaintiffs' claim; and the question in controversy between the parties on the trial was, whether there was an actual sale of the cotton goods, or whether they were delivered to the plaintiffs to be sold on commission, and the proceeds only applied to the credit of the defendants.

On the trial of the cause, a number of witnesses were called on each side to testify in relation to that question, whose testimony is only given so far as it has a bearing upon the points presented to the court for their opinion.

Robert D. Chapman.—I was in the employment of Allen & Grant from April to October 1834; was acquainted with the Telfords; there were a great many parcels of goods shipped during that time, from the warehouse of Allen & Grant. The goods were brought there by the Telfords, or one of them. The goods were shipped down the river on account of the Telfords. There was no account opened of these goods on the books of Allen & Grant. The shipment was made in the name of Adams, Allen & Co. I understood they were made in this way on account of the embarrassments of the Telfords. I have heard conversations between Mr M. Allen and the elder Mr Telford about sending these goods down the river. Telford always spoke of the profits and loss as his own. It was customary to draw drafts on the houses, in anticipation of the sale, to which the goods were sent. This was done at the instance of Telford. I recollect of a parcel of goods taken from our house by Mr Telford to John D. Davis. I can't say for certain why they were taken away, but believe it was on account of bad sales having been made in the west. The goods were sent down the river at Mr Telford's request. Telford was in the habit of calling and informing Allen when a lot of goods would be ready to send. I recollect of no goods sent, unless at the request of Telford. I have seen Telford receive money from Allen as an advance on the goods. I have heard Telford recommend places to send the goods to. Telford was always at the warehouse when the goods were marked.

[Telford v. Adams.]

I have seen Telford and Allen examine the returns of sales. Telford would sometimes say that the sales were good, and other sales he would say would never do, as they would ruin him, or words to that effect. I have heard Allen tell Telford that he must provide for some drafts drawn on the consignment of these goods, in case they should come back protested. I do not know what Telford said, but he did not dispute his liability. The consignees were directed to keep these accounts separate from the other accounts of Adams, Allen & Co., because they were for a different concern, and for the benefit of the manufacturers. I have heard Telford inquire as to particular sales, and have heard Allen remonstrate with Telford and advise him not to send goods down the river. Telford would insist on having consignments sent down.

In making out an invoice of articles, with persons unacquainted with business, the words 'bought of' are frequent. Telford's invoices were: 'Adams, Allen & Co. bought of Telford & Son.' I have seen invoices made in the same way. I always understood that the goods were shipped on account of Telford & Son. No charge made for commissions or services.

Cross-examined.—I understood that Telford & Son made the consignment in this form in order to conceal the property from the reach of their creditors. The consignments were all made to the correspondents of Adams, Allen & Co.; Telford's name did not appear. The merchants below would not have accepted the drafts of Telford & Son.

On the part of the defendants James Telford was called, who produced his book of original entries or invoices. Being sworn, he says: This is my book of original entries; part of it is a copy of invoices of goods sent down the river; the rest is of sales: the entry was made on the delivery of each parcel. I keep no other book. The following is a correct copy of the forms of entries made as to the goods which have originated the present controversy:

Sept. 8, 1830.      Adams, Allen & Co. bo't of J. Telford & Son:
49 pieces of check, No. 8, 1472 yds at 14 cts p'r yd   $205 65
25 pieces   do.      " 9,   756  " at 15    "            113 43, &c.

The goods are charged in the above form at various intervals, from September 8th, 1830, till September 1st, 1834. When goods were consigned by Messrs Telford & Son, the consignment was in the following form:

"Jan'y 11th, 1830—Messrs Ormsby & Co., Louisville: Gentlemen—Herein you have receipt and invoice of three boxes of domestic cotton goods of our manufacture: 41 pieces 4-4 fine check, 1443 3-4 yds at $0 17, $245 43, etc."—Which goods they are ordered to sell at the prices stipulated, and not less.

The form of the invoice of goods to Adams, Allen & Co. was: "Adams, Allen and Co. bo't of J. Telford and Son."

There were other witnesses examined on behalf of each party, but it is presumed that the above will be sufficient to explain the

nature of the controversy, and the points upon which the opinion of the court was requested.

The court were then requested by defendants' counsel, *to charge the jury as follows:*

1. Supposing Adams, Allen & Co. not to have actually bought from Telford, yet if, as testified by one of their witnesses, they consented to give the transaction the appearance of a sale, with the view, in certain contingencies, to baffle the creditors of Telford, then the law holds that the ostensible arrangement, though void as to creditors, is conclusive between the parties, and will not lend its aid to carry into effect any private understanding.

2. A person who undertakes *to forward goods for another* for sale, who sends them to his own correspondent, in his own name, and who claims the exclusive power over the goods and their proceeds, is bound, within a reasonable time, to render a distinct and comprehensive account; and if he fails so to do, the jury may presume that he makes the goods his own, and may charge him for the whole accordingly.

3. Supposing Adams, Allen & Co. to have received the goods into their hands as a collateral security, or to reimburse them for advances, they are equally bound to render such an account as is referred to in the preceding paragraph.

The court below, after recapitulating the evidence, and exhibiting the case clearly to the jury, thus answered the plaintiffs' points.

In answer to the first point, the court say as follows:

1st. It is necessary to look to the facts as proved in the case, in order to give to the first point of defendant an intelligible reply. In the abstract, and following the terms used by counsel, there can be no doubt that the law is as there stated.   But in what light are the present plaintiffs to be viewed: why surely, if *the jury* believe the testimony, as creditors themselves of James Telford and Son, at the time of, and in reference to the very transactions testified to by Chapman.

As such, they had, as I conceive, a perfect right to protect themselves to the amount of their advances, and to prevent those very articles to which they looked for reimbursement, from being taken by *other creditors of J.* Telford.   So long as they kept within their advances, the use of their names, instead of that of the owners of the goods, only tended to give them a preference over other creditors certainly not more meritorious; and if they did not propose to do more than give themselves their just preference, I cannot see that they become obnoxious to the principle of law adverted to by the defendants' counsel.

2d. As a general proposition, I concur with the defendants' counsel; but if the jury should be of opinion, that Adams, Allen & Co., acted in the forwarding of those goods for the accommodation of Telford & Son, that the returns of sales were from time to time exhibited to Telford & Son by the plaintiffs; that those returns of

[Telford v. Adams.]

sales were not objected to by the defendants so far as the plaintiffs were concerned; in a word, that Adams, Allen & Co., rendered the service (which, it appears, was performed without charge) wholly at the risk of the defendants, and gave to them all the accounts they had received of the sales of the goods, I am of opinion that there exists no rule of law, which, under such circumstances, would charge the plaintiffs with the whole amount of the invoice price of the goods.

3d. If the jury believe the testimony in the case, and that the transactions between the parties are such as indicated in the preceding answer, I cannot think that the plaintiffs were bound to do more than they did.

In conclusion, the jury will hardly take into consideration the relative wealth of the parties; nor whether they are connected with banks or insurance offices; nor will they be disposed to treat as a matter of reproach, the system and order observed by a party in his business transactions. If the defendants have not preserved papers, if they have not kept their books as accurately as might be, or if their business generally, be not conducted with strict regard to accuracy and order, this may be their misfortune, but an opposite course on the part of the plaintiffs, cannot justly be charged upon them as a fault.

Verdict for plaintiffs for 6548 dollars 78 cents.

*Livingston* and *Mahon*, for plaintiffs in error, relied mainly upon the error in the opinion of the court, in answer to the defendants' first point. They cited 13 *Serg. & Rawle* 225; 7 *Johns.* 161; 4 *Bibb.* 70; 2 *Littell* 12.

*Fetterman* and *Forward*, for defendants in error, cited 4 *Watts* 418; 5 *Binn.* 585; 1 *Watts* 135; 1 *Whart. Rep.* 224.

The opinion of the Court was delivered by

SERGEANT, J.—The evidence in this cause seems to show, that although the plaintiffs appeared to be purchasers on the face of the invoices and of the consignments to their correspondents, yet in truth, they were not so, but were merely factors to dispose of the manufactured goods on account of the defendants, and give them credit for the proceeds, the defendants remaining liable in account for balances that should remain due for yarn sold to them, or responsibilities incurred by the plaintiffs. Why such an arrangement was made, was a matter of dispute. The plaintiffs alleged, that it was a usual mode of transacting business, and called witnesses to prove instances in which goods were consigned by manufacturers to be sold on commission, and the same terms were employed. One of the plaintiffs' witnesses, however, stated in his examination in chief, that he always understood the shipments were made in that way, on account of the embarrassments of the

VI.—3 E

[Telford v. Adams.]

defendants, and that he had heard conversations on the subject between Mr Allen and the elder Mr Telford. He further stated in his cross-examination, that the plaintiffs, as he understood, made the consignments in their own name, to cover the property from the creditors of Telford, who was embarrassed. It was upon this view of the case, the defendant's first point was proposed, and there being evidence in relation to it which the jury might have believed, the question of law was pertinent. For, if the facts were as stated by this witness, the rule of law applied, that an arrangement made by the debtor and another, with a view to hinder or defeat his creditors, though it is voidable by them, yet it is binding between the parties themselves. It shall be as they have chosen to make it, and they will not be afterwards heard to allege, that it was a mere contrivance; different from the truth and facts of the case. This rule appears to be founded on principles of public policy, and is intended to deter men from engaging in forbidden transactions, by refusing relief as between themselves, and leaving them in the position they have assumed. In the case of Sickman *v.* Lapsley, 13 *Serg. & Rawle* 224, the subject is considered by Mr Justice Duncan, and the decision of the court recognizes the principle. The answer of the court below does not seem to have given the defendants the benefit of the rule of law to which they were entitled. The rule is admitted in the abstract to be correct, yet its application is denied, because the plaintiffs stood in the light of creditors themselves, and as such, had a right to secure a preference over other creditors. But it does not appear that the plaintiffs were creditors, except under the arrangement in question. And besides, the question does not turn on the right of the plaintiffs to secure a preference, if done innocently, either according to the usual custom or otherwise; but supposing the arrangement were made with a design to cover the property from the defendant's creditors, who might otherwise be induced to levy on it by execution, or to attach it elsewhere, would it not, though voidable as to creditors, be conclusive on the parties? For the reasons above given, it seems to me it would, and that the court ought so to have instructed the jury.

The other errors assigned, are not sustained. The answers of the court seem to be sufficient, and to be correct.

Judgment reversed, and a *venire facias de novo* awarded.