## HARCROW *v.* GARDINER.

Opinion delivered March 24, 1900.

PUBLIC POLICY—ILLEGAL AGREEMENT.—The illegality of an agreement between two partners in forming the partnership that the business should be carried on in the name of one of the partners only in order to deceive the creditors of the other partner will not affect with illegality a note subsequently executed by the former partner to the latter in settlement of the partnership business.

Appeal from Pulaski Chancery Court.

THOMAS B. MARTIN, Chancellor.

### STATEMENT BY THE COURT.

Action in equity upon the following note, and to enforce a vendor's lien upon the lands therein described.

"$9,000.00.                    LANARK, ARK., July 19, 1893.

"One day after date I promise to pay to the order of J. C. Harcrow the sum of nine thousand dollars for property, to-wit, two lots on 13th and Battery, in the city of Little Rock, one lot on 6th and Wolf streets, ten acres adjoining Valentine's addition, 80 acres known as the 'Gough place,' 60 acres known as 'W. H. Wheeler place,' 40 acres known as the 'Martindale place,' 40 acres known as the 'Turner place.'

[Signed]                                        "E. HARCROW."

The defense set up was want of consideration, and further that the note was part of a scheme to defraud the creditors of J. C. Harcrow. The facts appear in the opinion. The chancellor found against the defendant, and gave judgment accordingly. From this judgment the defendant appealed.

*F. T. Vaughan* and *James H. Stevenson,* for appellant.

The evidence does not show that J. C. Harcrow ever advanced any money to appellant. The "release" offered in evidence was genuine, and the chancellor erred in his finding to the contrary. On the right of witnesses to testify as to genuineness of signature, upon comparison and by memory, see 7 La. 95; 30 N. J. Law, 387;

8 Ark. 155; 5 McLean, 186; Laws. Exp. Ev. 317; 11 Ala. 855; 5 Neb. 248; 3 Jones' Law, 310: 41 N. Y. Supp. 6; 82 N. Y. 52. The findings of the chancellor as to the facts being against the evidence, the case should be reversed. As to difference between chancery cases and jury trials in this respect, see: 34 Ark. 212; 31 Ark. 85; 41 Ark. 292; 42 Ark. 521; 15 Ark. 209; 23 Ark. 341; 43 Ark. 307. There could be no lien in favor of J. C. Harcrow, because:

(1) An express lien by parol would contravene the statute of frauds. 25 Miss. 88.

(2) No lien by subrogation could exist, because: (a) The elements of subrogation are wanting. 2 Beach, Eq. § 868; Bisph. Eq. 335; 13 Oh. 148; 14 Ill. 468; 25 Miss. 88; Perry, Trusts, § 238; 163 Pa. St. 609; 1 Am. & Eng. Dec. in Eq. 472, 505 *n.*; 2 Beach. Eq. § 801; Jones, Liens, §§ 73, 1067; 1 N. Y. 586; 18 Ark. 142; 10 Ark. 411; 4 Lea, 216; 10 Heisk. 522; 16 La. Ann. 292; 5 Rob. 204; 86 Pa. St. 409; 56 Pa. St. 76; 38 N. J. Eq. 105; 14 N. J. Eq. 235; 61 Ala. 108; 3 Ala. 302; 25 Ark. 133; 44 Ark. 504; 47 Ark. 118; 50 Ark. 109. The fraud in the original transaction precludes any subrogation. 2 Beach, Eq. § 819; 38 Ala. 625; 81 N. Y. 394; 4 Dill. 207; 33 Kan. 90; 117 Ill. 145; 53 Ark. 271; Sheld. Sub. §§ 42, 44; Harr. Sub. § 813; 94 N. Y. 82; 105 N. Y. 539.

(3) There never having been a sale of the property, J. C. Harcrow had no vendor's lien in his own right. 2 Jones, Liens, § 1066; 121 Ill. 191. If we assume that there was an advancement, the evidence shows strong badges of fraud on J. C. Harcrow's part. Bump, Fr. Con. §§ 46, 49, 51, 53, 63. There could be no resulting trust in favor of J. C. Harcrow because of the fraud on the creditors. 17 So. 185; 4 Barb. 425; 6 Oh. St. 52; 2 Dev. Eq. 497; 19 N. J. Eq. 546; 26 Ind. 319; 1 Beach, Tr. § 125, p. 155; 1 Beach, Eq. § 217, p. 244; 1 Perry, Tr. § 151, p. 181; 10 Am. & Eng. Enc. Law, 57, 58; 50 Mo. 572; 4 Halst. 891; 10 Am. & Eng. Enc. Law, 14. To raise such a trust there must have been an advancement of a definitely ascertained amount at the time of the purchase of the property and with the intention of raising such a trust. Tied. Eq. § 311; 1 Beach, Eq. 217, 219; 30 Ark. 230; 29 Ark. 612; 32 Miss. 190; 27 Ark. 89; 2 Paige, Ch. 217; 10 Am. & Eng. Enc. Law, 5, 8, 12, 13 and 14; 9 Ark. 529; 21 Md. 32. The evidence of these facts must be clear and convincing. Tied. Eq. Jur. § 311; 27 Ark. 89; 2 Paige, Ch. 217; 5 Johns. Ch. 18, 19; 1 Beach, Eq. § 224; 81 Va. 152; 15 Oh. 148; 19 Ia. 362; Perry, Tr. § 137; 19 N. J. Eq. 549; 44 Ark. 365; 114 Ill. 554; *id.* 636; 21 Md. 328; 10 Am. & Eng. Enc. Law,

23, §§ 11, 12, 13, 14, 16 and 17. The fraud bars recovery on the note. Equity refuses to grant relief to either party to an executory contract to defraud creditors. 26 Ark. 317; 52 Ark. 171; 10 Ark. 54; 11 Ark. 411; *ib.* 475; 19 Ark. 650, 659; 26 Ark. 316; 47 Ark. 301; Bump, Fr. Con. § 432; 11 Ill. 300; 50 Am. Dec. 460, 469 *n*; 29 Ill 524; 45 *id.* 23; 3 Mass. 378; 23 N. J. Eq. 60; 15 Am. Dec. 596, 600; 38 *id.* 578. No recovery can be had upon a note given as the consideration of a fraudulent transfer. 33 N. J. Law, 318; 20 Wend. 37; S. C. 4 Hill, 424; 9 Dana, 318; 21 Ill. 152; 10 Me. 71; 3 Paige, Ch. 154; 49 Mass. 269; 3 Dana, 540; 1 Oh. St. 262; 126 Ill. 525; 8 Cush. 525; 58 Barb. 390; Wait, Fr. Con. 395; 25 Mo. 165; 1 M. & W. 159-166; 2 Lans. 103; 10 Barb. 369; 34 S. W. 755; 65 Tex. 499; 65 Tex. 217. This principle extends to the personal representative of the fraudulent grantor. 19 Ark. 659; 4 Ark. 173; 13 Ark. 593; Bump, Fr. Con. § 433; 11 Ill. 300; S. C. 50 Am. Dec. 460, 469, note; 42 Am. Dec. 168. The statute of 1895 (Laws 1895, pp. 165-6) does not apply, so as to authorize the administrator to bring this suit, because that statute includes only transfers of realty. The statute, being in derogation of common law, will not be extended by implication. Suth. Stat. Const. § 400; 78 Ala. 111; 50 Miss. 517; 56 Barb. 51; 77 N. Y. 36; 3 Den. 220; 85 Ill. 197; 3 Barb. 341; 38 Miss. 118; Suth. Stat. Const. § 208; 44 Miss. 322; 21 N. Y. 148; 46 Me. 377; 4 W. Va. 383; 87 Pa. St. 253; 5 Mich. 98; 6 *ib.* 242; *ib.* 17; 20 Wend. 181; *ib.* 555; 20 Johns. 361; *ib.* 342; 3 Cow. 59; 5 Hill, 461; 1 Barb. 185; 6 Hill, 149; 7 *ib.* 431; 3 Den. 601; 3 N. Y. 396; 31 Mich. 431; 18 Ga. 333. Nor can the act be construed retrospectively. 11 Wis. 371; 39 Miss. 364; Suth. St. Const. §§ 463, 464; 6 Ark. 484, 493; 56 Ark. 485, 495; 1 N. Y. 129; S. C. 1 Den. 128; 6 Hill, 149; 33 Gratt. 677; 58 Barb. 176; Wade, Ret. Laws, 34-5-6; 7 Johns. 504; 17 Hun. 457; 46 Mich. 278; 20 *id.* 398; Sedg. St. Con. 160; Cooley, Con. Lim. 455; 26 Ark. 127; 15 Wis. 548; 1 Black, 459.

*Z. T. Wood* and *W. S. & F. L. McCain,* for appellee.

If J. C. Harcrow furnished the money to buy the land, he would be entitled to a lien without any express agreement. 40 Ark. 62. If the parties intended by the note that J. C. should have a lien, equity will effectuate that intention. 51 Ark. 433; 60 Ark. 598; 52 Ark. 441. The act of 1895 applies to authorize the administrator to sue. 58 Ark. 117; 43 Ark. 156; Sch. Ex. and Adm. § 320. A release must have a consideration. 31 Ark. 728; 33 Ark. 572; 40

Ark. 182. Re-delivery of the note was essential to make the release good as a gift. 2 Kent's Comm. 438; 60 Ark. 169.

RIDDICK, J., (after stating the facts). This is an action by the administrator of the estate of J. C. Harcrow against Elbert Harcrow to recover judgment upon a promissory note for the sum of nine thousand dollars, and to declare the same a lien upon the land described in the note.

The first contention of the defendant is that there was no consideration for the note. He states that his brother, J. C. Harcrow, during his last sickness was living with one Sallie Smith, a woman with whom he had sustained immoral relations, and by whom he had illegitimate children. His brother, so defendant testified, said to him that the woman was annoying him by insisting that he should make some provision for her and her children, and that, at the urgent request of his brother, and to appease the woman, this note was executed, under a promise that his brother would in a few days return the note. In a day or two afterwards he called upon his brother, and asked for the note. His brother requested the woman to get it, and give it to defendant, but it had been mislaid, and could not then be found; so, instead of returning the note, his brother executed to him a receipt in writing, stating that he had received payment of the note in full. This is his story, and there is much other evidence bearing on this point, but we need not discuss it. The questions as to whether this note was without consideration, and whether the receipt purporting to be signed by J. C. Harcrow was genuine or forged, were submitted to the chancellor, who found against the defendant, and we can by no means say that this finding is clearly against the weight of evidence. If defendant be injured by such finding there is little ground for sympathy, for by his own confession this note was executed as a part of a scheme to deceive a wronged and ignorant woman. If this be true, and he is compelled to pay the note, it is a case of one caught in his own trap. But we do not believe that any mistake was made. At the time this note was executed, J. C. Harcrow, besides these illegitimate children, had, living in the same county, a lawful wife and child. As this fact was well known, it is not apparent why the execution of this note to him should have been regarded by Sallie Smith as a provision for her or her children. It does not appear that the attempted return of the note, of which defendant testified, was kept secret from her, nor why the possession of it for only a brief time

would have tended in any way to shield the brother of defendant from her importunities. In fact, the whole story of the defendant in reference to the execution of the note and the written release seems to us unreasonable and improbable. It is in conflict with the facts stated in the amendment to his answer, in which he alleged that the land for which the note purports to have been executed was purchased by defendant and J. C. Harcrow jointly, and the title taken in the name of the defendant for the purpose of covering up the interest of J. C. Harcrow in such property and defrauding his creditors. After considering this amendment in connection with the other facts in proof, we have very little doubt about the correctness of the finding of the chancellor on this point, and it must stand.

The facts in this case, as we see them, can be briefly stated. About 1881 the defendant and his brother commenced the mercantiie business together as partners at Lanark in this state. J. C. Harcrow had previously failed in business, and this new business venture was carried on in the name of the defendant, Elbert Harcrow. The capital they invested in it was no doubt small, but the business prospered, and after some years the firm had a surplus of money on hand. This money was from time to time invested in land for the benefit of the firm, and the title taken in the name of Elbert Harcrow, that, as before stated, being the name in which the business was carried on. In this way after some ten or twelve years the whole or nearly all of the firm's assets were converted into land. In 1893 J. C. Harcrow was stricken with consumption, and, knowing that the end of life was approaching, he sent for his brother, and they had some kind of a settlement of their partnership affairs, and the note upon which this action is based was given by the defendant to his brother for his share of the partnership assets, which, as before stated, consisted mainly, if not altogether, of land. The note on its face purports to have been executed for certain tracts of land therein described, they being, as we think, that portion of the firm's assets allotted to J. C. Harcrow in the settlement.

The contention is made that, under these facts, the action cannot be maintained, because, it is said, the property was conveyed to the defendant for the purpose of defrauding the creditors of J. C. Harcrow. The question as to whether one who sells property to another for the purpose of defrauding his creditors can maintain an action on a note given by the vendee for the purchase money has been much discussed by the courts of the different states. Quite a number of them hold that such actions cannot be maintained, and

that view has been approved by this court. *Payne* v. *Bruton*, 10 Ark. 53; *Nellis* v. *Clark*, 20 Wend. (N. Y.), 24; *Nellis* v. *Clark*, 4 Hill (N. Y.), 424; *Church* v. *Muir*, 33 N. J. Law, 318; *Davis* v. *Sittig*, 65 Texas, 499; *Norris* v. *Norris*, 9 Dana (Ky.), 317; note to *Whitworth* v. *Thomas*, 3 Am. St. Rep. 727.

On the other hand several of the ablest courts hold, under statutes similar to ours, that by the terms of the statute such contracts, though void as to creditors, are valid and binding between the parties. *Stillings* v. *Turner*, 153 Mass. 534; *Still* v. *Buzzell*, 60 Vt. 478; *Harvey* v. *Varney*, 98 Mass. 118; *Carpenter* v. *McClure*, 39 Vt. 9; *Dyer* v. *Homer*, 22 Pick (Mass.), 253; *Gary* v. *Jacobson*, 55 Miss. 204; *Butler* v. *Moore*, 73 Me. 151; *Davy* v. *Kelley*, 66 Wis. 452; *Winton* v. *Freeman*, 102 Pa. St. 366.

But, while the discussion of this question by the various courts furnishes an interesting chapter in the history of our jurisprudence, we do not see that it arises in this case. The ground upon which the courts which refuse to enforce such contracts base their decision is that such contracts are forbidden by law and illegal. But we are not asked in this suit to enforce an illegal contract. The note upon which this action is based was given by one partner to another in settlement of their partnership affairs. If we concede that when this partnership was first formed it was agreed that the business should be carried on in the name of the defendant in order to deceive the creditors of the other partner, that would be no defense here, for this is not an action upon the partnership agreement. The illegality, if any, consisted in such prior agreement, not in the partnership business, nor in the settlement between the parties by which they undertook to divide the partnership assets, and therefore it is no defense to the enforcement of the subsequent contract based on such settlement. This question was considered by the High Court of Chancery of England in the case of *Sharp* v. *Taylor*. The parties were British subjects and owners of a ship which, in violation of an act of parliament, they had registered in the United States in the name of a citizen of this country as an American vessel, in order to evade the registry laws of England. The plaintiff brought an action for an account, and the defendant among other defenses set up that the plaintiff's claim was in violation of law. But Lord Cottenham, after remarking that the plaintiff was not asking to enforce any agreement adverse to the act of parliament, nor seeking compensation for an illegal voyage, proceeded as follows: "Can one

of two partners possess himself of the property of the firm, and be permitted to retain it if he can show that in realizing it some provision or some act of parliament has been violated or neglected? The answer to this will be that the transaction alleged to be illegal is completed and closed, and will not be in any manner affected by what the court is asked to do between the parties." *Sharp* v. *Taylor,* 22 Eng. Ch. 801.

Though these words of the Lord Chancellor have been often quoted with approval by the courts of this country, including the Supreme Court of the United States, they have not escaped criticism, either here or in England. Sir George Jessel, speaking of this case in *Sykes* v. *Beadon,* 11 Ch. Div. 170, while not denying that the judgment of the Lord Chancellor was correct, criticised the language used as being broad enough to include illegal partnerships of all kinds. But this criticism of the Master of the Rolls does not weaken the case of *Sharp* v. *Taylor* as an authority for the position we take here, for the partnership between J. C. Harcrow and the defendant was not an illegal partnership.

If this partnership had been formed for the purpose of carrying on a gambling house, or for the sale of intoxicating liquors without a license, or for any other illegal and prohibited business, a very different question would be presented; for then the case would come within the rule asserted with so much force in *Sykes* v. *Beadon,* that courts will not interfere or assist in dividing the proceeds of an illegal business or transaction. The evidence shows nothing of the kind here. The partnership was formed for the purpose of keeping and carrying on a small country store, a business neither immoral nor illegal. And, although one member of the firm kept from the public his connection with the firm, remaining a secret or silent partner, that did not render the firm's business illegal, even if we admit that the object was to avoid an attachment by his creditors, for this was only an incident, and not the main purpose of the partnership. The cases cited below show, we think, that, had there been no settlement between the parties, and no note executed, the courts would have sustained an action against the defendant to compel him to account for the partnership assets in his hands. If this be so, there is no reason, when the partners themselves have made the settlement, why the note executed in pursuance of such settlement should not be enforced, nothing appearing to indicate mistake or unfairness in the settlement. *Sharp* v. *Taylor,* 22 Eng.

Chan. 801; *Brooks* v. *Martin*, 2 Wallace (U. S.), 70; *McBlair* v. *Gibbes*, 17 Howard (U. S.), 232; *Harvey* v. *Varney*, 98 Mass. 118; *Wilson* v. *Owen*, 30 Mich. 474; *Gilliam* v. *Brown*, 43 Miss. 641; 1 Bates on Part. § 122; 2 Pomeroy's Eq. (2 Ed.) and note to § 940.

There is another ground on which we think the contention of the defendant on this point must fail.  The evidence, as we have stated, shows that J. C. Harcrow failed in business about 1880, but it was nine or ten years afterwards before the land was purchased by the firm.  The defendant himself testified that the old debts against J. C. Harcrow were barred by limitation, and at the time of his death in 1893 he seems to have been comparatively free from debt.  Whether there were valid and subsisting debts against him at the time the firm purchased this land, the evidence does not show.  Even if we should adopt the view contended for by appellant, it seems that the evidence on this point is not sufficient; for, if defendant is to be allowed to retain land owned by his brother without paying for it, on the ground of fraud against third parties, such fraud should be clearly established, and, unless J. C. Harcrow owed debts at the time this land was purchased, no fraud is shown.

Our attention has been called to the act of 1895, passed after the commencement of this action, authorizing an administrator of a fraudulent grantor to bring suit to set aside the fraudulent conveyance, but, as we have concluded that this action can be maintained regardless of that act, we need not notice the discussion in reference to the same.

We have given due attention to the cases collated in the able brief filed by counsel for appellant, but we are unable to adopt their views as to the proper disposition of the case.  Our conclusion is that the judgment of the chancellor is right, and it is therefore affirmed.

The CHIEF JUSTICE and WOOD, J., concur.

BATTLE, J., (dissenting).  The facts in this case, as I understand them, are as follows:  Sometime in 1880 or 1881, J. C. Harcrow was engaged in a mercantile business at Monticello, in this state, and his younger brother, Elbert Harcrow, was his clerk. Becoming much involved in debt, in fact insolvent, he conveyed all his property to his brother Elbert in order to defraud his creditors, who recovered many judgments against him on the indebtedness he was owing at the time of the fraudulent transfer, which have never been paid.  Elbert continued the business ostensibly in his

own name and on his own account at Monticello for many years, and then removed to Lanark, in Bradley county, in this state, where he continued the same business, which he conducted at Monticello, on his own account. J. C. accompanied and remained with him for some time, but openly disclaimed any interest in the business or the capital invested in the same. In time J. C. left Elbert and the business at Lanark, and came to Little Rock. Elbert prospered in this business, and succeeded in thereby accumulating several thousand dollars. This money J. C., claiming no interest in it, but asserting that it was the property of his brother, and pretending to be the agent of his brother, invested in real estate, mostly in Little Rock, which he caused to be conveyed to Elbert. In the consummation of the fraudulent scheme, so successfully managed for many years, in the year 1893 the two brothers divided between themselves the property out of the benefits of which they had defrauded creditors by the conduct and management of business in the manner stated. The result of the division was the execution by Elbert to J. C. of the note sued on as J. C.'s part of the ill-gotten gains. The right of appellee to recover in this action depends upon the validity of this note. Was it valid?

By an act approved December 6, 1837, the general assembly of this state declared as follows: "Every conveyance or assignment, in writing or otherwise, of any estate or interest in lands, or in goods and chattels, or things in action, or of any rents issuing therefrom, and every charge upon lands, goods or things in action, or upon the rents and profits thereof, and every bond, suit, judgment, decree or execution, made or contrived with the intent to hinder, delay or defraud creditors or other persons of their lawful actions, damages, forfeitures, debts or demands, as against creditors and purchasers prior and subsequent, shall be void." Sand & H. Dig. § 3472.

And by an act approved February 16, 1838, it enacted: "Every person who shall be a party to any conveyance or assignment of any real estate, or interest in any real estate, goods or chose in action, or any rents or profits issuing therefrom, or to any charge upon such estate, with intent to defraud any prior or subsequent purchaser, or to hinder, delay or defraud creditors or other persons, shall be deemed guilty of a misdemeanor, and on conviction shall be fined in any sum not less than five hundred dollars." *Id.* § 1577.

Under these and similar statutes all agree that contracts based

upon sales, transfers, conveyances or assignments of property made to defraud the creditors of one or both of the parties thereto are void as to such creditors, but as to the validity of such contracts between the parties there is a considerable contrariety of opinion. Many courts hold that such contracts are also void as to the parties to the same. *Nellis* v. *Clark,* 4 Hill, 424; *Nellis* v. *Clark,* 20 Wend. 24; *Collins* v. *Blantern,* 2 Wils. 341; *Smith* v. *Hubbs,* 10 Me. 71; *Niver* v. *Best,* 10 Barb. 369; *Norris* v. *Norris,* 9 Dana, 317; *Harvin* v.*Weeks,* 11 Rich. (S. C.), 601; *Church* v. *Muir,* 33 N. J. L. 318; *Merrick* v. *Butler,* 2 Lans. 103; *Powell* v. *Inman,* 82 Am. Dec. (N. C.) 426; *Ager* v. *Duncan,* 50 Cal. 325; *Walker* v. *McConnico,* 10 Yerg. 228; *McCausland* v. *Ralston,* 28 Am. Rep. (Nev.), 781; *Hamilton* v. *Scull,* 25 Mo. 165, 69 Am. Dec. 460; *Fenton* v. *Ham,* 35 Mo. 409; *Harwood* v. *Knapper,* 50 Mo. 456; *Goudy* v. *Gebhart,* 1 Ohio St. 262; *Rasher* v. *E. Detroit etc. Ry. Co.* 90 Mich. 413; *Bradford* v. *Beyer,* 17 Ohio St. 388; *Galpin* v. *Galpin,* 74 Iowa, 454; *Sweet* v. *Tinslar,* 52 Barb. 271; *Williams* v. *Clink,* 90 Mich. 297; *Cadogan* v. *Kennett,* 2 Cowp. 434; *Davis* v. *Sittig,* 65 Texas, 499; Bump on Fraudulent Conveyances (last Ed.), §§ 432, 434, 435 and 444, and cases cited. In this view the Supreme Court of this state concurred with these authorities in *Payne* v. *Bruton,* 10 Ark. 53. On the other hand, several courts under similar statutes hold that such contracts, though void as to creditors, are valid as to the parties. *Carpenter* v. *McClure,* 39 Vt. 9; *Findley* v. *Cooley,* 1 Blackf. 262; *Telford* v. *Adams,* 6 Watts, 429; *Sherk* v. *Endress,* 3 W. & S. 255; *Dyer* v. *Homer,* 22 Pick. 253; *Clemens* v. *Clemens,* 28 Wis. 637; *Harris* v. *Harris,* 26 Gratt. 737; *Dietrich* v. *Koch,* 35 Wis. 618; *Butler* v. *Moore,* 73 Me. 151; *Winton* v. *Freeman,* 102 Pa. St. 366; *Gary* v. *Jacobson,* 55 Miss. 204; *Hawes* v. *Loader,* Yelv. 197; *Bredon's Appeal,* 92 Pa. St. 246; and other cases cited in the opinion of the court. Some of the courts which take the latter view do so upon their statutes, which make such contracts void only as to the creditors whose right, debt, or duty is attempted to be avoided, holding that the word *only* used in the statutes is a word of limitation, confining the invalidating effect of the statute to such creditors. *Carpenter* v. *McClure,* 39 Vt. 12; *Dyer* v. *Homer,* 22 *Pick.* 253; *Hawes* v. *Loader,* Yelv. 197. But there is no such limitation in our statute. On the contrary, all sales, transfers, conveyances and assignments of any property made with the intent to defraud creditors is prohibited, and made a misdemeanor by statute

in this state, the penalty for which is a fine not less than $500. Sand. & H. Dig. § 1577. According to the general rule, no action will lie to enforce contracts made in consideration of sales, transfers, conveyances or assignments made in violation of such statutes, or to recover damages on account of the non-performance thereof, or for any relief based thereon. Under the statutes of this state, the former, in my opinion, is clearly the correct and more reasonable view.

It is said in the opinion of the court: "We are not asked in this suit to enforce an illegal contract. The note upon which this action is based was given by one partner to another in settlement of their partnership affairs. If we concede that when this partnership was first formed it was agreed that business should be carried on in the name of the defendant in order to deceive the creditors of the other partner, that would be no defense here, for this is not an action upon the partnership agreement. The illegality, if any, consisted in such prior agreement, not in the partnership business, nor in the settlement between the parties by which they undertook to divide the partnership assets, and therefore it is no defense to the enforcement of the subsequent contract based on such settlement."

This statement is erroneous for the following reasons:

First. Because it assumes that Elbert and J. C. Harcrow entered into an ordinary partnership for the purpose of doing a mercantile business.

Second. It assumes that the business was lawful, regardless of the purpose for which it was carried on; for it says "the illegality, if any, consisted in such prior agreement, not in the partnership business."

Third. Because it assumes that the consideration, purpose, or the object of the execution, of the note cannot be inquired into in this action; for the action is not based upon the agreement upon which the business was conducted, and because the illegality, if any, consisted in such agreement, and not in the partnership business. nor in the settlement by which the parties undertook to divide their partnership assets.

I will notice these errors in the order in which they are stated.

*First.* There was no partnership ostensibly formed between Elbert and J. C. Harcrow. The latter was engaged in a mercantile business at Monticello, became insolvent, and conveyed and assigned all his property used in such business to Elbert to defraud

his creditors. (These facts are conceded to be true by appellant and appellee.) After this Elbert carried on the business in his own name, and as his own. He removed to Lanark, and there continued the same business as he had at Monticello. As the assets employed in the business were converted into money, J. C., as the agent of Elbert, carried the money to Little Rock, and invested it in real estate, and took the title to the same in the name of Elbert, at the same time disclaiming any interest therein. Many years after this, when the end of his life was near, he induced his brother Elbert to execute the note sued on for the property which he had purchased, and to which he had taken the title in the name of Elbert, without any other consideration, describing it in the note. The facts and circumstances shown in the evidence clearly prove a scheme to defraud the creditors of J. C. by the sale to Elbert, by the conduct of the business in the name of Elbert, and by the purchase of the real estate. The execution of the note, under the circumstances, is virtually a confession by both parties of the fraud.

*Second.* A business, apart from its purpose or object, may be lawful, but if it be carried on for an unlawful purpose, or to hinder, delay, or defraud creditors, it is illegal. It is lawful to convey property, and for the grantee to use and hold it, but if it be conveyed and held to defraud the creditors of the grantor, it is illegal; and so it is as to any business or property.

*Third.* When a deed, note, or other contract is made for an illegal purpose, or its consideration is illegal, contrary to public policy, whatever may be stated in it, a defendant against whom it is sought to be enforced may show such purpose or consideration; and when shown the court will not enforce it. He can not be prevented by the form of the action in which it is sought to be enforced, or by the instrument sued on, from making such proof and defeating the action. *Roe* v. *Kiser,* 62 Ark. 92; *Martin* v. *Clarke,* 8 R. I. 389; *Dale* v. *Roosevelt,* 9 Cow. 307; *Wilson* v. *Haecker,* 85 Ill. 349; 1 Greenleaf, Evidence (16th Ed.), § 284; 2 Wharton, Evidence (3rd Ed.), § 935, and cases hereinafter cited.

But the court says in its opinion: "If we concede that when this partnership was first formed it was agreed that the business should be carried on in the name of the defendant in order to deceive the creditors of the other partner, that would be no defense here, for this is not an action upon the partnership agreement.

The illegality, if any, consisted in such prior agreement, not in the partnership business, nor in the settlement between the parties by which they undertook to divide the partnership assets." I dissent from this view of the law of the case. If the note sued on was executed without any new consideration, but was made in pursuance of the prior fraudulent agreement or undertaking of Elbert and J. C. Harcrow, or in furtherance of its object, or sprang out of it, it is void. A few decisions and quotations from opinions of courts will serve to make the truth of what I have said appear more clearly.

*Armstrong* v. *Toler,* 11 Wheat. 258, "was an action of assumpsit, brought by the defendant in error, Toler, against the plaintiff in error, Armstrong, to recover a sum of money paid by Toler on account of goods, the property of Armstrong and others, consigned to Toler, which had been seized and libelled in the district court of Maine in the year 1814, as having been imported contrary to law. The goods were shipped during the war with Great Britain, at St. Johns, in the province of New Brunswick, for Armstrong and other citizens and residents of the United States and consigned to Toler, also a domiciled citizen of the United States. The goods were delivered to the agent of the claimants on stipulation to abide the result of the suit, Toler becoming liable for the appraised value; and Armstrong's part of the goods were afterwards delivered to him, on his promise to pay Toler his proportion of any sum for which Toler might be liable, should the goods be condemned. The goods having been condemned, Toler paid their appraised value, and brought this action to recover back from Armstrong his proportion of the amount. At the trial of the cause, the defendant below resisted the demand, on the principle that the contract was void, as having been made on an illegal consideration."

The court held, "where a contract grows immediately out of, and is connected with, an illegal or immoral act, a court of justice will not lend its aid to enforce it. So, if the contract be in part only connected with the illegal consideration, and growing immediately out of it, though it be, in fact, a new contract, it is equally tainted by it. But if the promise be entirely disconnected with the illegal act, and is founded on a new consideration, it is not affected by the act, although it was known to the party to whom the promise was made, and although he was the contriver and conductor of the illegal act. Thus, where A., during a war, contrived a plan for importing goods on his own account from the

enemy's country, and goods were sent by B. by the same vessel; A., at the request of B., became surety for the payment of the duties on B.'s goods, and became responsible for the expenses on prosecution for the illegal importation of the goods, and was compelled to pay them. Held, that A. might maintain an action on the promise of B. to refund the money. But if the importation is the result of a scheme between the plaintiff and defendant, or if the plaintiff has any interest in the goods, or if they are consigned to him with his privity, in order that he may protect them for the owner, a promise to repay any advances made under such understanding or agreement (to pay duties and expenses of prosecution) is utterly void."

In *Niver* v. *Best,* 10 Barb. 369, land was sold by the owner to defraud his creditors, and afterwards the purchaser executed a note to the vendor for the land, and the court held that, though such note was given subsequently, yet if there was no new consideration for it, and it was made either in pursuance of the original fraudulent agreement, or in furtherance of its object, it was void; and cited *Armstrong* v. *Toler,* 11 Wheat. 258, to support its ruling.

*Embrey* v. *Jemison,* 131 U. S. 336, was an "action of debt to recover from the plaintiff in error, who was the defendant below, the amount of four negotiable notes executed by him, January 21, 1878, and payable at the office of E. S. Jemison & Company in the city of New York, to the order of Moody & Jemison, by whom they were endorsed, before maturity, to the plaintiff, Jemison." The following was, substantially, the history of the notes:   In February or March, 1877, the defendant contracted with the firm of Moody & Jemison, brokers and commission merchants of the city of New York, and members of the Cotton Echange, to purchase for him through the plaintiff, one of that firm, "on a margin," in said Cotton Exchange, not actual cotton, but four thousand bales of "future delivery cotton," for May delivery, commonly called "futures," which he did.   The purchase or delivery of actual cotton was never contemplated, either by the defendant or Moody & Jemison, and it was understood between them that the settlement on account of the cotton should be made by one party paying to the other the difference between the contract price and the market price of said cotton futures, according to the fluctuations in the market. Upon settlement between the defendant and Moody & Jemison, on account of moneys expended by the firm in the purchase of cotton futures for the defendant, the notes sued upon were executed for the balance due.   The court held that such contract was illegal

and void; and that the original payee could not maintain an action upon the notes, the consideration of which was money advanced by him upon or in execution of a contract of wager, he being a party to such contract, or having directly participated in the making of it in the name or on behalf of one of the parties. Mr. Justice Harlan, delivering the opinion of the court, said: "Assuming the averments of the plea of wager to be true, it is clear that the plaintiff could not recover upon the original agreement without disclosing the fact that it was one that could not be enforced or made the basis of a judgment. He can not be permitted to withdraw attention from this feature of the transaction by the device of obtaining notes for the amount claimed under the illegal agreement; for they are not founded on any new or independent consideration, but are only written promises to pay that which the obligor had verbally agreed to pay. They do not, in any just sense, constitute a distinct or collateral contract based upon a valid consideration. Nor do they represent anything of value, in the hands of the defendant, which, in good conscience, belongs to the plaintiff or to his firm. Although the burden of proof is on the obligor to show the real consideration, the execution of the notes could not obliterate the substantial fact that they grew immediately out of, and are directly connected with, a wagering contract. They must, therefore, be regarded as tainted with the illegality of that contract, the benefits of which the plaintiff seeks to obtain by this suit. That the defendant executed the notes with full knowledge of all the facts is of no moment. The defense he makes is not allowed for his sake, but to maintain the policy of the law. *Coppell* v. *Hall,* 7 Wall. 542, 558."

In *McMullen* v. *Hoffman,* 174 U. S. 639, the facts were substantially as follows: The city of Portland, in Oregon, proposing to receive bids for the construction of what was called the Bull Run pipe, Hoffman, of Portland, and McMullen, of San Francisco, agreed to put in separate bids for the same and, in the event it was awarded to either of them, to perform the contract and bear equally the expenses of the work and divide the profits, share and share alike. Both put in bids. Hoffman's bid was for $455,722 and McMullen's for $514,664. There were several other bids, but Hoffman's bid was the lowest of all. The contract was awarded to him. During all this time and until after the award they concealed the fact that they had united their interests, that they were acting in concert, and were to divide the profits. After the contract was

awarded, they entered into a contract in writing, having left out of it the illegal and objectionable part of the parol agreement, which (the written contract) is, in part, as follows: "This agreement made and entered into by and between Lee Hoffman, of Portland, Oregon, doing business under the name of Hoffman & Bates, party of the first part, and John McMullen, of San Francisco, California, party of the second part, witnesseth: That whereas said Hoffman and Bates have, with the assistance of said McMullen, at a recent bidding on the work of manufacturing and laying steel pipe from Mount Tabor to the head works of the Bull Run water system for Portland, submitted the lowest bid for said work, and expect to enter into a contract with the water committee of the city of Portland for doing such work, the contract having been awarded to said Hoffman and Bates on said bid. It is now hereby agreed that said Hoffman and said McMullen shall and will share in said contract equally, each to furnish and pay one-half of the expense of executing the same, and each to receive one-half of the profits or bear and pay one-half of the losses which shall result therefrom." Hoffman did the work and received the pay, and McMullen sued for his portion of the profits according to the contract. The court held "that this contract was illegal, not only as tending to lessen competition, but also because the parties had committed a fraud in combining their interests and concealing the same, and in submitting the different bids as if they were *bona fide,* and that the court will not lend its assistance in any way towards carrying out the terms of an illegal contract, nor will it or any court enforce any alleged rights directly springing from such contract."

The court said: "The complainant can not count only upon the contract of partnership as evidenced by the writing of March, 1893 (the above written contract). That writing evidenced only a portion of the agreement that had been made between these parties, the result being that, although their averment was in the first instance by parol, a portion of it was subsequently reduced to writing. The whole contract is none the less one and indivisible, just as much as if it had been put in writing. If it had, it would scarcely be argued that complainant might maintain an action by relying on that part of it which was valid and relating to the partnership between them, and that he might discard or omit to prove that which was illegal. If the complainant did not, the defendant could, prove the whole contract, as well the part lying in

parol as that which was reduced to writing, so that the court might, upon an inspection of the whole contract, determine therefrom its character. The unity of the contract is not severed or its meaning or effect in any degree altered by putting part of it in writing and leaving the rest in parol."

According to the rule stated and the cases cited in support of it, was the note sued on in this action valid? It is as follows: "$9,000.00.                    Lanark, Ark., July 10, 1893.

One day after date I promise to pay to the order of J. C. Harcrow the sum of nine thousand dollars for property, to-wit: Two lots on Fifteenth and Battery, in the city of Little Rock, one lot on Sixth and Wolf streets, ten acres adjoining Valentine's Addition, eighty acres known as the Gough place, sixty-nine acres known as the W. H. Wheeler place, forty acres known as the Martindale place, forty acres known as the Turner place.

(Signed)                              E. HARCROW."

The consideration, as shown by the note, was the purchase money for which property was sold by J. C. to Elbert Harcrow. But it was not. The property described in the note was sold and conveyed to Elbert, and was held by him in his own name. Why should he be converted into a purchaser, and a note given for purchase money, when no sale had in fact been made? Why should J. C. Harcrow be converted into a vendor, when he, as agent, purchased the property for Elbert, and disclaimed any interest in it? From the time J. C. became insolvent, and conveyed and assigned his property to Elbert to defraud his creditors, and Elbert took control of the business so transferred, he conducted it in his own name, and with the proceeds of the same purchased property, and held it as his own. In this manner, and in pursuance of a fraudulent scheme, he for many years conducted the business and acquired property without break or interruption until the note in question was executed. All this, the conveyance and assignment to Elbert by his brother and all that followed, constituted one and the same fraudulent scheme. Why was the note given? I see no reason, unless it was done in furtherance of the agreement or object of the undertaking by which the two brothers undertook to defraud the creditors of J. C. Harcrow. This fact was not obliterated by the execution of a note for the amount claimed under the illegal agreement; for it was not founded on any new or independent consideration. If the note had not been executed, upon what agreement or contract could J. C. Harcrow or

his representatives have in any manner claimed anything? I can see none, except the obligation assumed by Elbert whereby he confederated with his brother to defraud creditors and the acquisition of property in pursuance thereof. The execution of the note was the settlement of this fraudulent business, and, until it was validated by the judgment of this court, was void.

It is said in the opinion of this court that, "unless J. C. Harcrow owed debts at the time the land was purchased, no fraud is shown." As I understand the evidence, it was proved. But, be that as it may, I think it clearly appears that the land was purchased in pursuance of the illegal and immoral obligation which Elbert entered into at the time J. C. Harcrow conveyed his property to him at Monticello to defraud his creditors, and that it was in furtherance of this obligation the lands were purchased and the note was executed. All that was done in pursuance of this iniquitous undertaking was tainted by it and rendered illegal. Time alone will not purge it of its iniquity, as intimated in the opinion of the court, and courts will not aid J. C. Harcrow, or his representatives, in the enforcement of any executory part of his fraudulent scheme, but leave them "in the tangled web which he has assisted to weave to catch others."

I think that the decree of the chancery court should be reversed, and that the complaint in the action should be dismissed.

HUGHES, J. I concur in this opinion.