MACKIN v. SHANNON et al.

(Circuit Court, E. D. Arkansas, W. D.   November 25, 1908.)

GAMING (§ 19*)—VALIDITY—OBLIGATIONS FOR GAMBLING CONSIDERATIONS.

A note and mortgage executed in settlement of a partnership formed to carry on a gambling establishment in violation of the laws of the state, without any new consideration, are void for illegality of the consideration, and will not be enforced by a court of equity.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 39; Dec. Dig. § 19.*]

In Equity.

Rose, Hemingway, Cantrell & Loughborough, for plaintiff.
Greaves & Martin, for defendants.

TRIEBER, District Judge. The plaintiff has filed his bill to foreclose a mortgage executed to him by the defendant William T. Shannon to secure the payment of a note for the sum of $10,000, due six months after date. The other defendants are made parties as claiming some rights in the mortgaged property. The mortgagor, the defendant William T. Shannon, admits the execution of the note and mortgage sued on, but sets up that the same were executed in settlement of a gambling debt, and for this reason are null and void. The allegations in the answer are:

"That on the 24th day of February, 1905, he and the plaintiff entered into a copartnership for the purpose of carrying on and conducting the Kentucky Club, a gaming house, in the city of Hot Springs, Ark., for the season of 1905. That said copartnership continued until the 2d day of April, 1905, at which time it was dissolved by mutual consent of the plaintiff and this defendant. That upon the day of the dissolution, by reason of certain payments made by this defendant to the plaintiff, there was due the said plaintiff the sum of $9,432, and the note sued on herein ought to have been credited by the plaintiff in a sum sufficient to reduce the indebtedness therein mentioned to said sum."

The other defendants filed separate answers, but it is unnecessary, in view of the conclusions reached by the court, to set them out in this statement of facts. There was a general replication filed by the plaintiff, and considerable proof taken by the parties. The proofs are somewhat contradictory, but adopting as findings of facts the testimony of the plaintiff and the conclusions advanced by his counsel, which are, of course, most favorable to him, they may be stated as follows:

That the defendant William T. Shannon was the owner of a gambling house in the city of Hot Springs known as the "Kentucky Clubhouse," where all kinds of gambling were carried on. That one part of the establishment was used exclusively for banking games, such as roulette, faro, and horse wheel, while in another part of the building there were poker rooms, from which the house received certain commissions. That in February, 1905, the plaintiff, being in the city of Hot Springs, was introduced to the defendant Shannon, and was informed that the Kentucky Clubhouse was in financial distress, owing considerable money which it was unable to pay. Thereupon an ar-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

rangement was made whereby the plaintiff was to put in $10,000, and was to have 30 per cent. of the business and the defendant Shannon the other 70 per cent. That he put $10,000 into the business, and a day or so later put in $5,000 additional. That thereafter he inquired where the money was, and he was referred to John Kelly, who was the cashier of the gambling establishment, who first told him that the money was deposited in the bank. Plaintiff told him that he did not want the money there, that he wanted it in the house, and thereupon Kelly promised he would draw it out of the bank and put it in the house the next morning. On the same day Kelly came back and informed plaintiff that at various times he had advanced $12,202 of that money to the defendant Shannon. The bank roll was always to be the plaintiff's property, provided it was not lost in the game, and in addition he was to have 30 per cent. of the profits. He saw Shannon, and after some conversations this settlement was made, whereby the defendant executed, without any new, valid, or adequate consideration, his note for $10,000, and secured it by the execution of a chattel mortgage on the property therein described. It seems that some of the money missing had been lost in the poker game carried on in the gambling establishment, the evidence tending to show that it was customary, if not a sufficient number of men could be secured to play poker, and strangers desired to indulge in the game, that some member of the house would be one of the players, and any moneys lost by him would be charged to the house, and it was also customary that strangers who were supposed to be "good" would give their due-bills for the losses sustained by them, many of them afterwards refusing to pay them. But the plaintiff claims that the partnership of Mackin & Shannon had nothing to do with the poker game. Plaintiff's interest in the partnership, as claimed by him, included only the roulette wheel, the faro bank, and the horse wheel, and not the poker game. There have been some payments made on the note, being moneys collected on duebills executed for the gambling debts which had been turned over to the plaintiff, while others refused to pay these due-bills.

Assuming these to be the undisputed facts, the question is whether he can invoke the aid of a court of equity, or any other court, for the purpose of collecting this note and foreclosing the mortgage executed by the defendant to secure it.

The keeping of a gaming house is malum in se. as well as malum prohibitum, under the laws of the state of Arkansas, which provide for heavy penalties against those maintaining such an establishment. See sections 2737 to 2752, Kirby's Dig. St. Ark. 1904. While it is conceded by counsel for plaintiff that no court of law or equity will enforce a contract to carry on such a business or aid either party to the contract to maintain an action arising therefrom, it is contended that when the parties themselves have had a settlement, and upon such settlement a balance is found to be due to one of the parties from the other, and the latter executes to the other a note for the amount agreed upon as due, an action upon that note may be maintained. To maintain this proposition counsel rely upon the following cases: Sharp

v. Taylor, 2 Phil. Ch. 801, 817; Brooks v. Martin, 2 Wall. 70, 17 L. Ed. 732; Planters' Bank v. Union Bank, 16 Wall. 483, 21 L. Ed. 473; Armstrong v. American Exchange National Bank, 133 U. S. 433, 10 Sup. Ct. 450, 33 L. Ed. 747; O'Bryan v. Fitzpatrick, 48 Ark. 487, 3 S. W. 527; Harcrow v. Gardiner, 69 Ark. 6, 58 S. W. 553, 64 S. W. 881; and other cases following the above decisions.

Planters' Bank v. Union Bank and O'Bryan v. Fitzpatrick are clearly inapplicable to the case at bar. The principle laid down in those cases is that a third person or agent is not discharged from accounting to his principal, or the person for whose benefit the money or property was delivered to him, by reason of past unlawful acts or intentions of the principal collateral to the matter of the agency. This is the rule established by the English courts as early as 1797 in Tenant v. Elliott, 1 B. & P. 3; and followed in Farmer v. Russell, 1 Bos. & Pul. 295, Johnson v. Landsley, 12 C. B. 468, and Bridger v. Savage, 15 Q. B. Div. 363, and followed by the American courts generally.

It will serve no useful purpose to review these cases and the many other cases following them. On the other hand, the authorities are not only numerous, but practically unanimous, that the execution of notes with securities in settlement of an illegal contract does not purge the new promise from the illegal consideration; the reason therefor being that the new promise is founded upon the illegal consideration—a debt or demand growing out of the illegal transaction—and is as infirm in the eye of the law as the implied promise that existed previous to the giving of the notes. Fisher v. Bridges, 3 E. & B. 642; Sykes v. Beadon, 11 Ch. Div. 170; Brown v. Tarkington, 3 Wall. 377, 381, 18 L. Ed. 255; Coppell v. Hall, 7 Wall. 542, 558, 19 L. Ed. 244; Dent v. Ferguson, 132 U. S. 50, 67, 10 Sup. Ct. 13, 33 L. Ed. 242; Embrey v. Jemison, 131 U. S. 336, 348, 9 Sup. Ct. 776, 33 L. Ed. 172; Morris v. Norton, 75 Fed. 912, 927, 21 C. C. A. 553, 568; Watson v. Murray, 23 N. J. Eq. 257, 262; King v. Winants, 71 N. C. 469, 473, 17 Am. Rep. 11; Clemshire v. Boone County Bank, 53 Ark. 512, 14 S. W. 901; Shaffner v. Pinchback, 133 Ill. 410, 24 N. E. 867, 23 Am. St. Rep. 624; Whitesides v. McGrath, 15 La. Ann. 401; Plank v. Jackson, 128 Ind. 424, 26 N. E. 568, 27 N. E. 1117; Jackson v. McLain's Ex'rs, 100 Mo. 130, 13 S. W. 393.

In Fisher v. Bridges the plea to the action upon a covenant to pay money was that the consideration of the covenant to pay was a conveyance of land for an illegal object, and this was held by Jervis, C. J., delivering the opinion of the Exchequer Chamber, to be a good plea, reversing the judgment of the Queen's Bench, 2 E. & B. 118. The Chief Justice in his opinion said:

"The agreement, being illegal, could not be enforced, and no action could be brought for the recovery of the purchase money of the lands, the subject of the illegal agreement. * * * But it is said that the covenant may be good and may be enforced at law, even though the original agreement were illegal and the purchase money not recoverable, if it had not been secured by an instrument under seal. It is certainly true that for a bond or other instrument under seal no consideration is necessary, but it does not therefore follow that every such instrument may be enforced by an action. The authorities cited in the argument show that where the bond or other instrument is connected with the illegal agreement it cannot be enforced, and therefore, if

this plea advanced that the covenant was given in pursuance of the illegal agreement, it would, upon these authorities, be no answer to the action. But if it is not so understood, we think it shows a good defense. It is clear that the covenant was given for the payment of the purchase money. It springs from, and is a creature of, the illegal agreement; and as the law will not enforce the original illegal contract, so neither will it allow the parties to enforce a security for the purchase money which, by the original bargain, was tainted with illegality."

In Sykes v. Beadon, decided by that eminent jurist, Sir George Jessel, Master of the Rolls, the English authorities on this subject are carefully reviewed, and the law stated as follows:

"I think the principle is clear that you cannot directly enforce an illegal contract, and you cannot ask the court to assist you in carrying it out. You cannot enforce it indirectly; that is, by claiming damages or compensation for the breach of it, or contribution from the person making the profits realized from it. It does not follow that you cannot in some cases recover money paid over to third persons in pursuance to the contract; and it does not follow that you cannot in other cases obtain, even from the parties to the contract, moneys which they have become possessed of by representation that the contract was legal, and which belonged to the persons who seek to recover them; but I am bound to say I think there is no pretense for saying that the contract could in any way be enforced or aided by a court of law or equity."

In Coppell v. Hall it was held that when a contract is illegal, there can be no waiver, for the reason that:

"The defense is allowed, not for the sake of the defendant, but of the law itself. The principle is indispensable to the purity of its administration. It will not enforce what it has forbidden and denounced. The maxim 'Ex dolo malo non oritur actio,' is limited by no such qualification."

In Embrey v. Jemison it was sought to recover on a note executed upon a settlement made of a wagering contract for futures, plaintiff insisting, as is done in this case, that the settlement and execution of the notes purged the transaction of its original illegality; but the court held:

"He cannot be permitted to withdraw attention from this feature of the transaction by the device of obtaining notes for the amount claimed under that illegal agreement; for they are not founded on any new or independent consideration, but are only written promises to pay that which the obligor had verbally agreed to pay. They do not, in any just sense, constitute a distinct or collateral contract based upon a valid consideration. Nor do they represent anything of value in the hands of the defendant, which, in good conscience, belongs to the plaintiff or to his firm. Although the burden of proof is on the obligor to show the real consideration, the execution of the notes could not obliterate the substantive fact that they grew immediately out of, and are directly connected with, a wagering contract. They must, therefore, be regarded as tainted with the illegality of that contract, the benefits of which the plaintiff seeks to obtain by this suit. That the defendant executed the notes with full knowledge of all the facts is of no moment. The defense he makes is not allowed for his sake, but to maintain the policy of the law."

In Dent v. Ferguson, where it was sought to recover property conveyed to defraud the grantor's creditors, the same contention was made that a new contract entered into between the parties purged it of the original taint of illegality; but the court, after a full review of the authorities, overruled this contention, saying:

"The principle established by those decisions in diversified forms, according to the varying cases, is that a new contract, founded on a new and independent consideration, although in relation to property respecting which there had been unlawful or fraudulent transactions between the parties, will be dealt with by the courts on its own merits. If the new contract be fair and lawful, and the new consideration be valid and adequate, it will be enforced. If, however, it be unfair or fraudulent, or the new consideration so inadequate as to import fraud, imposition, or undue influence, it will be rescinded and justice done the parties."

And, after citing cases, the court proceeds:

"But in all of those cases the court was careful to distinguish and sever the new contract from the original illegal contract."

In Morris v. Norton, Judge Taft, speaking for the United States Circuit Court of Appeals for the Sixth Circuit, held not only that a note given by one in nowise connected with the illegal transaction (deals in futures on margins, which are held to be wagering contracts), who felt in honor bound to reimburse a loss sustained by a payee through trust in a broker recommended by the maker, is void if there is no other valuable consideration, but in addition thereto said:

"More than this, the note would be void for illegality, because it would merely be evidence of Morris' assumption of the broker's obligation to pay a gambling debt without any new consideration. It would be the same debt with only a change of debtors, and would be subject to the same defense of illegality in the new deal as in the old."

In Clemshire v. Boone County Bank it was held that a promissory note, the sole consideration for which was an interest in a telephone exchange company whose business would infringe upon the patent rights of another company, cannot be enforced.

In Shaffner v. Pinchback the parties formed a partnership for the purpose of bookmaking, each contributing $1,000 as the capital. In a suit by one of the partners against the other to recover money, it was said:

"It is urged that the view that the defendant can keep the $1,000 furnished by plaintiff without any consideration therefor is so opposed to reason and conscience as to be untenable. * * * They are, in respect to such business, in pari delicto, and the law will refuse its aid to assist either, but will leave them in the position in which they placed themselves. Plaintiff, having embarked his money in an enterprise prohibited by a statute as against good conscience and public policy, has placed himself away and entirely outside the pale of the law, and if he has been despoiled by the failure of his associate to account for the funds placed in his hands for the purpose of carrying on the unlawful business, then both good morals and public policy require that the law should not aid him."

In Plank v. Jackson it was held that it is a good defense to an action on a note that the note sued on was given for money borrowed for the purpose of being used in gambling contracts or in paying losses sustained on account of such contracts.

In Whitesides v. McGrath it was held that an action to recover on a note given by defendant to make up his loss as a partner of plaintiff's and others in a faro banking game could not be maintained, as the association or partnership was not only against good morals, but it was criminal, and courts of justice are not open to that kind of litigants.

It may, therefore, be said that the law is well settled that where an

agreement of partnership is illegal on account of the consideration moving between the partners, or the character of the business to be transacted, the courts will not, after the business has been transacted, aid either of the parties to recover from another who shows that a note has been executed in settlement thereof, no other valid or adequate consideration intervening, and a settlement and execution of a note will not take the case out of the rule.

A later case in which this entire subject is very fully treated and the authorities carefully reviewed is McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117, which in the opinion of this court is practically conclusive of the case at bar. The most important case cited on behalf of plaintiff, and which comes nearer sustaining his contention, is Brooks v. Martin, but if that case has not been overruled, it has been much weakened by subsequent decisions of the Supreme Court. In McMullen v. Hoffman, the court, after reviewing that case and showing that none of the English cases cited by the court in Brooks v. Martin. with the exception of Sharp v. Taylor, sustained the conclusions reached in that case, says of Brooks v. Martin:

"There is a difference between the case before us and that of Brooks v. Martin. because in the latter case the fact existed that the transactions, in regard to which the cause of action was based. were not fraudulent, and they related in some sense to private matters, while in the case before the court the entire contract was a fraud and was illegal, and related to a public letting by a municipal corporation for work involving a large amount of money, and in which the whole municipality was vitally interested. It may be difficult to base a distinction of principle upon these differences. We do not now decide whether they exist or not. We simply say that, taking that case into due and fair consideration, we will not extend its authority at all beyond the facts therein stated. We think it should not control the decision of the case now before us."

Sharp v. Taylor, the only English case which the court in McMullen v. Hoffman thinks sustains the conclusions reached in Brooks v. Martin. was practically overruled by Jessel, Master of the Rolls, in Sykes v. Beadon, and has been seriously questioned, as was Brooks v. Martin, by many of the American courts, other than the Supreme Court of the United States in McMullen v. Hoffman. See Wald's Pollock on Contracts. p. 500. note 60, where many authorities are collected.

In the case at bar the original contract was clearly illegal, as it was a contract to carry on a gambling establishment in violation of the laws of the state where it was to be conducted. The note was executed in settlement of that partnership, without any new consideration whatever. If the contention of counsel for plaintiff is sustained, then the plea of illegal consideration could never be set up in defense to an action on a note executed in settlement of an illegal contract.

It was further claimed in the argument that under the agreement between the parties the money furnished by the plaintiff was to remain his property, and was to be used solely for the purpose of paying the losses of the gambling house, and that the taking of the money by the defendant was in violation of the contract. Assuming this to be established by the evidence, it does not change the rule of law. Plaintiff furnished the money for the purpose of carrying on an illegal business in violation of the laws of the state, and if his partner misappropriated

the funds while carrying on that business, the business itself being illegal, the courts will not aid him, not for the protection of the defendant, but for the protection of the public, upon the ground that such a transaction is against public policy. As was said in King v. Winants, by Mr. Justice Reade, who delivered the opinion of the Supreme Court of North Carolina, in that case:

"Two men enter into a conspiracy to rob on the highway, and they do rob, and while one is holding the traveler the other rifles his pocket of one thousand dollars and then refuses to divide; and the other files a bill to settle up the partnership, when they go into all the wicked details of the conspiracy, the rencounter, and the treachery. Will a court of justice hear them? No case can be found where a court has allowed itself to be so abused. Now, if these robbers had taken the thousand dollars and invested it in some legitimate business as partners, and had afterwards sought the aid of the court to settle up that legitimate business, the court would not have gone back to inquire how they first got the money; that would have been a past transaction, not necessary to be mentioned in the settlement of the new business. And this illustrates the case of Brooks v. Martin, so much relied upon by plaintiff."

It may be a hardship on the plaintiff that he should be deprived of his money, but he knew when he entered into the agreement with the defendant that he would be engaged in the commission of a crime. He may have relied upon the fact that it is often said that "there is honor among thieves," but the defense and the facts of this case show that this is not universally the case. Parties coming into courts for relief must come with clean hands, otherwise public policy forbids the courts from aiding them.

There will be a decree dismissing the bill.